**UNITED STATED DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

MUHAMMAD ARSHAD,

                    **PLAINTIFF,**

     -against-

TRANSPORTATION SYSTEMS, INC.;
EXECUTIVE TRANSPORTATION
GROUP LTD.; LOVE CORPORATE
CAR INC., LOVE LIMOUSINE NYC,
LTD, d/b/a U.S.A. LIMO INC.,
and BLUE LINE CORPORATE CAR;
JOHN ACIERNO; JEFFREY ACIERNO;
FRED SOLOMON; and,
HAIDER "Wally" HAIDERE,

                   **DEFENDANTS.**
-------------------------------------------------------------X

CASE NO.

**COMPLAINT**

**JURY TRIAL DEMANDED**

     The Plaintiff, Muhammad Arshad, by and through his undersigned counsel, the Law Office of Daniela Nanau, P.C., hereby complains about Defendants Transportation Systems, Inc.; Executive Transportation Group Ltd.; Love Limousine NYC Ltd., doing business as Blue Line Corporate Car and USA Limo Inc.; John L. Acierno; Jeffery Acierno; Fred Solomon; and Haider "Wally" Haidere as follows:

## JURISDICTION AND VENUE

     1.    This case involves claims of hostile work environment based on Plaintiff's race, national origin and religion, and retaliation, brought pursuant to 42 U.S.C. § 1981 ("Section 1981"); Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and

the New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York ("City Law"), as amended.

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1343. This Court has supplemental jurisdiction over Plaintiff's City Law claims pursuant to 28 U.S.C. § 1367.

3.      Venue is proper pursuant to Title VII's special venue provision, 42 U.S.C. § 2000e-5(f) (3), because the Southern District of New York is the judicial district in which the unlawful employment practices alleged herein were committed, and pursuant to an agreement entered into by the parties.

## THE PARTIES

### THE PLAINTIFF

4.      Plaintiff Muhammad Arshad (hereinafter "Plaintiff" or "Arshad") is a New York resident who is originally from Pakistan.

5.      Plaintiff is an adherent of the Sunni Muslim faith.

6.      Arshad worked for Defendants as a black car driver from December 2006 until his illegal discharge on or about March 6, 2014.

7.      Plaintiff had a contractual relationship with Defendants within the meaning of 42 U.S.C. § 1981.

### THE DEFENDANTS

### Transportation Systems, Inc. and Executive Transportation Group

8.      Defendant Transportation Systems, Inc., doing business as Executive Transportation Group Ltd. ("ETG"), provides luxury car and

limousine transportation services, mainly to corporate customers in the New York City tri-state area.

9.    ETG is a main provider of transportation services in what is known as the "black car" industry.

## ETG Franchise Companies

10.    ETG runs its business through a number of separately incorporated franchise companies, including but not limited to Defendants Love Corporate Car Inc., ("Love Corp. Car") Love Limousine NYC, Ltd. ("Love Limousine"), d/b/a U.S.A. Limo, Inc. ("USA Limo") and Blue Line Corporate Car ( "Blue Line"), which all operate out of one single headquarters located at 1440 39th Street in Brooklyn, New York.

11.    At all relevant times, ETG was an "employer" within the meaning of Title VII, Section 1981, and the City Law.

12.    ETG and its franchise companies will be referred to herein as the "ETG Defendants."

## John L. Acierno

13.    Upon information and belief, John L. Acierno is a resident of Short Hills, New Jersey.

14.    John L. Acierno is the President and Chief Executive Officer of ETG. As such, John L. Acierno owns and/or operates ETG.

15.    John L. Acierno is an employer within the meaning of Title VII, Section 1981 and the City Law.

16.     At all relevant times, John L. Acierno had power over personnel decisions at ETG, including but not limited to the power to hire and fire employees of ETG and all of its related franchise companies, including but not limited to Blue Line and/or USA Limo.

17.     At all relevant times, John L. Acierno controlled the conditions of employment for all employees of ETG, and all of its related franchise companies, including but not limited to Blue Line and/or USA Limo, including Plaintiff.

18.     John L. Acierno condoned the discriminatory and retaliatory treatment of Plaintiff, which Defendants had actual notice of, by failing to remedy it.

19.     At all relevant times, John L. Acierno used his position as owner, Chief Executive Officer, and/or shareholder to "aid and abet" in the discrimination of Plaintiff as those terms are defined and applied under the City Law § 8-107(6).

**Jeffrey Acierno**

20.     Upon information and belief, Jeffrey Acierno is a resident of Marlboro, New Jersey.

21.     Jeffrey Acierno is the Executive Vice President of ETG. As such, Jeffrey Acierno owns and/or operates ETG.

22.     Jeffrey Acierno is an employer within the meaning of Title VII, Section 1981 and the City Law.

23.     At all relevant times, Jeffrey Acierno had power over personnel decisions at ETG, including but not limited to the power to hire and fire employees of ETG and all of its related franchise companies, including but not limited to Blue Line and/or USA Limo.

24.     At all relevant times, Jeffrey Acierno controlled the conditions of employment for all employees of ETG, and all of its related franchise companies, including but not limited to Blue Line and/or USA Limo, including Plaintiff.

25.     Jeffrey Acierno condoned the discriminatory and retaliatory treatment of Plaintiff, which Defendants had actual notice of, by failing to remedy it.

26.     At all relevant times, Jeffrey Acierno used his position as owner, Executive Vice President, and/or shareholder to "aid and abet" in the discrimination of Plaintiff as those terms are defined and applied under the City Law § 8-107(6).

**<u>Fred Solomon</u>**

27.     Upon information and belief, Defendant Fred Solomon is a resident of Brooklyn, New York.

28.     Defendant Solomon is an owner and/or manager of Blue Line.

29.     Defendant Solomon is an employer within the meaning of Title VII, Section 1981 and the City Law.

30.     At all relevant times, Defendant Solomon had power over personnel decisions at Blue Line, including but not limited to the power to hire and fire employees of Blue Line.

31.     At all relevant times, Defendant Solomon controlled the conditions of employment for all employees of Blue Line, including Plaintiff.

32.     Defendant Solomon condoned the discriminatory and retaliatory treatment of Plaintiff, which Defendants had actual notice of, by failing to remedy it.

33.     At all relevant times, Defendant Solomon used his position as owner, manager, and/or shareholder to "aid and abet" in the discrimination of Plaintiff as those terms are defined and applied under the City Law § 8-107(6).

**Haider "Wally" Haidere**

34.     Upon information and belief, Defendant Haider "Wally" Haidere, referred to herein as "Chairman Wally," is  a resident of New York, New York.

35.     Chairman Wally is originally from Afghanistan.

36.     Chairman Wally is an adherent of Shia, or Shiite, Islam.

37.     Chairman Wally owns and/or operates Blue Line.

38.     At all relevant times, Chairman Wally has had power over personnel decisions at Blue Line, including but not limited to the power to hire and fire employees of Blue Line.

39.     At all relevant times, Chairman Wally has controlled the conditions of employment for all employees of Blue Line, including Plaintiff.

40.     At all relevant times, Chairman Wally has actively participated in the discriminatory and retaliatory treatment of Plaintiff.

41.     Chairman Wally is an employer within the meaning of Title VII, Section 1981 and the City Law.

## EXHAUSTON OF ADMINISTRATIVE REMEDIES

42.     On or about April 2014, Plaintiff filed a Charge of Discrimination alleging racial harassment and retaliation with the United States Equal Employment Opportunity Commission ("EEOC"). Plaintiff's Charge of Discrimination was assigned number 520-2014-02005.

43.     Plaintiff has obtained a Notice of Right to Sue letter from the EEOC because more than 180 days have passed since the filing of his Charge of Discrimination.

44.     This Complaint is timely filed within 90 days of Plaintiff's receipt of the Notice of Right to Sue.

## FACTS RELEVANT TO ALL CLAIMS

### Plaintiff's So-Called Franchise Agreement with Blue Line

45.     To work as a black car driver for Blue Line, Defendants required Arshad to pay thousands of dollars in so-called franchise fees.

46.     From December 2006 until in or about March 2007, Plaintiff worked at Blue Line by renting a "franchise" from another driver.

47.     In or about March 2007, Arshad purchased his own Blue Line "franchise" from ETG's franchise company, Love Limousine, for approximately $56,000.

48.     Plaintiff purchased the so-called Blue Line franchise pursuant to a boilerplate, non-negotiable "subscription" agreement (referred to herein as the "franchise agreement") furnished to him by Defendant John L. Acierno, who also executed the franchise agreement entered into with Plaintiff on behalf of Defendants.

49.     Pursuant to this franchise agreement, Defendants controlled the terms and conditions of Plaintiff's employment at Blue Line by, *inter alia*, mandating that he "abide by all rules and regulations set forth in the Company's manual of rules and regulations," which will be referred to as the "Blue Line Handbook."

50.     Arshad received a copy of the Blue Line Handbook from Defendant Jeffrey Acierno when he began working at Blue Line in 2006 by renting a so-called Blue Line franchise from another driver.

51.     The Blue Line Handbook contains, *inter alia*, a "Driver Code[] [of] Conduct" and information regarding disciplinary measures imposed on drivers by Defendants who violate the handbook's rules.

**Blue Line's Chairman And Security Committee**

52.     Instead of maintaining a staffed human resources department, Defendants maintain a "Security Committee" and employ a "Chairman" at

8

Blue Line department to monitor driver conduct and impose discipline on those drivers who are found to have violated work rules.

53.     According to the Blue Line Handbook, all disciplinary actions taken against the drivers by the Chairman and Security Committee are subject to oversight by an "Appeals Committee," which is controlled by Defendants and their managerial employees.

54.     The Blue Line Handbook, including but not limited to the most recent iteration, which is dated September 15, 2010, was authored by Defendant John L. Acierno, without any input from Blue Line drivers.

55.     The Blue Line Handbook's rules greatly circumscribe the pool of eligible candidates for the position of Chairman. For example, only drivers who own a franchise for five (5) or more years are eligible, and only if they are in good standing, which is defined as having had no "security convictions" for the two (2) years prior to their nomination.

56.     According to the Blue Line Handbook, the Chairman is the only person on the Security Committee selected directly by the drivers.

57.     According to the Blue Line Handbook, Defendants must approve of all drivers selected by the Chairman to serve on the Security Committee with him, and Blue Line drivers are afforded no opportunity for input into the selection of drivers who serve on the Security Committee.

58.     Since 2006, when Plaintiff began working for Blue Line, only two (2) drivers have served as Chairman of the Security Committee.

**For Almost One Decade, Defendant Haidere Has Been Chairman**

59.    Defendants manage and oversee the so-called election for Security Committee Chairman at Blue Line each year.

60.    Defendant Haidere, who is known at Blue Line as "Chairman Wally" has served as the Chairman of the Blue Line Security Committee every year that Plaintiff worked at Blue Line except one.

61.    In 2008, Chairman Wally lost Blue Line's so-called election for Chairman for the first and only time because Defendants actively endorsed another candidate, Isak Benjamin, Blue Line Car Driver No. 2429 (hereinafter referred to as "Benjamin").

62.    Upon information and belief, Defendants did not support Chairman Wally in 2008 because they blamed him for overbilling that caused the loss of one of ETG's largest corporate clients, Bank of America.

63.    Prior to serving as the Chairman of the Security Committee, Chairman Wally worked for Blue Line as a black car driver.

64.    Upon information and belief, Chairman Wally has not worked as a black car driver since he first assumed the position of Blue Line's Security Committee Chairman, although Defendants continue to pay him .

**Blue Line's So-Called Disciplinary Process**

65.    Blue Line driver conduct is regulated with the issuance of "slips," which are defined by the Blue Line Handbook as "formal complaint[s]" brought against the driver.

66.     According to the Blue Line Handbook, Defendants' management team, the Chairman, and members of the Security Committee are the only individuals who may "pull slips" on drivers believed to have violated one or more handbook rules.

67.     According to the Blue Line Handbook, once a slip is pulled on a driver, he is entitled to prompt notice of the alleged violation and the opportunity to present a defense at a Security Committee meeting before any discipline is imposed.

68.     Monetary penalties imposed on drivers for rule violations are listed in the Blue Line Handbook in detail, and range from $100 to $1500.

69.     Discipline for certain violations includes temporary suspensions, or being made "blue," which is defined in the Handbook as the "temporary denial of a unit's access to the Company's dispatch system."

70.     Blue Line drivers may also be "expelled" from Blue Line for certain infractions of the Handbook rules.

71.     Defendants do not compensate Blue Line drivers who are expelled for the value of their so-called franchise.

72.     Once expelled, drivers like Plaintiff are deprived of obtaining any value for "franchises" they purchased for tens of thousands of dollars to be able to work at Blue Line.

**Chairman Wally Has Subjected Plaintiff and Other Pakistani Drivers to a Hostile Work Environment and Other Discriminatory Treatment**

73.    On or about September 1, 2013, Arshad received notice from Blue Line dispatch that Chairman Wally had issued a slip against him for allegedly turning off the GPS on his Blue Line-issued Blackberry, which is a handbook rule violation.

74.    Several days after that slip was issued, on or about September 3, 2013, Plaintiff met with a Blue Line manager, Defendant Solomon, to discuss Chairman Wally's slip.

75.    At that time, Arshad explained to Defendant Solomon that his Blackberry device had been turned on at the time Chairman Wally alleged that it was off, although the GPS system had failed to detect it inside Plaintiff's home, where Arshad was preparing for a Blue Line job.

76.    After reviewing Arshad's GPS record, Defendant Solomon agreed that Chairman Wally's slip was baseless and promised Plaintiff: "I'll squish this slip."

77.    Defendant Solomon further advised Plaintiff that he did not have to attend any Security Committee meeting regarding the baseless slip.

78.    Upon information and belief, no Security Committee meetings were held in September or October 2013.

79.    On November 11, 2013, a Security Committee disciplinary meeting was held, which Arshad did not attend because of Defendant Solomon's directive not to.

80.     On or about December 9, 2013, Plaintiff went to the ETG complex in Brooklyn for the annual inspection of his car, which was conducted by two members of the Security Committee, Surjeet Nfn, Car Driver No. 2387, and Jerzy Przezdziek ("Przezdziek"), Car Driver No. 2456.

81.     After the inspection, Plaintiff was ready to depart when Przezdziek asked Arshad if he would be attending the Security Committee meeting scheduled for that day regarding Plaintiff's outstanding slips.

82.     Unaware of any slip other than the GPS-related one, Arshad immediately went to speak with Defendant Solomon, who again advised Plaintiff not to attend any Security Committee.

83.     After his meeting with Defendant Solomon, while walking back to his car, Arshad saw Chairman Wally on the sidewalk outside of ETG.

84.     As soon as Chairman Wally neared Plaintiff, he started screaming at him, calling him a "mother fucker" and "mother fucking Pakistani nigger."

85.     Chairman Wally threatened Plaintiff, telling him: "No one can help you now.  I am the Chairman and I will fuck you."

86.     Shocked by Chairman Wally's violent behavior, Arshad said nothing, got into his car and drove away.

87.     Hours after Chairman Wally's verbal assault, Security Committee member Fereydoun Fani ("Fani"), Blue Line Car Driver No. 2347, called Plaintiff and asked him, "Why were you no show for [the] slip meeting?"

88.     During the call with Fani, Arshad could hear Chairman Wally screaming and cursing at him in the background.

89.     Plaintiff informed Fani that he had been instructed by Defendant Solomon not to attend any Security Committee meeting.

90.     Later that same day, a message was sent through the Blue Line dispatch to all drivers, which stated that Plaintiff was being fined $200, although no explanation for the fine was provided to Arshad in the dispatch message or at any time thereafter, in violation of Blue Line rules.

91.     Chairman Wally's harassment of Arshad, by verbally abusing him and by issuing to him baseless slips, is similar to the manner in which Chairman Wally has harassed other Blue Line drivers from Pakistan because of their race, national origin, and religion, during Plaintiff's tenure working for Defendants.

92.     For example, in or about 2010 or 2011, Chairman Wally expelled another Pakistani driver who is a Sunni Muslim, Bilal Gul ("Gul"), Blue Line Driver No. 2353, for protesting several baseless slips that Chairman Wally issued against him.

93.     At Gul's hearing before the Security Committee, Chairman Wally held Gul responsible for a late pick-up at Meadowlands Arena, even though Blue Line drivers are not sanctioned for late pick-ups at locations where it is difficult to locate a customer, such as a sports area like the Meadowlands.

94. In addition, Chairman Wally held Gul accountable for stale slips, some almost two years old, which were so vaguely worded it was difficult to understand what Gul was accused of doing wrong.

95. Gul represented himself at the hearing regarding these alleged slips and openly challenged Chairman Wally for using baseless allegations to drive him out of Blue Line.

96. In response to Gul's protestations, Chairman Wally verbally abused Gul in front of the Security Committee, calling Gul a "fucking Pakistani," a "fucking mother fucker" and a "nigger" among other insults.

97. Gul appealed Chairman Wally's determination. However, Defendants' management team condoned Chairman Wally's discriminatory treatment of Gul by refusing to reconsider the decision to expel him.

98. Rana Shabaz ("Shabaz"), former Blue Line Driver No. 2259, is originally from Pakistan and a Sunni Muslim.

99. Shabaz served on the Security Committee with Chairman Wally for one or two years.

100. After serving for a short while on the Security Committee, Shabaz began to openly object to the harsh discipline that Chairman Wally meted out to Pakistani drivers like Gul.

101. In response, Chairman Wally began to issue bogus slips against Shabaz starting in or about 2011.

102.   The slips issued by Chairman Wally against Shabaz alleged, *inter alia*, that Shabaz turned off his GPS during work hours.

103.   During this time period, Chairman Wally also physically and verbally abused Shabaz.

104.   During an informal dinner attended by other drivers, Shabaz tried to engage Chairman Wally in conversation about where he is originally from and about his life before he emigrated to the United States.

105.   At some point during their conversation, Shabaz remarked about Chairman Wally: "Oh, you're Shia."

106.   In response, Chairman Wally became immediately upset and acted as if Shabaz, who is Sunni Muslim, had insulted him.

107.   Chairman Wally expressed his anger with Shabaz by throwing him up against a gated storefront and by verbally abusing him, screaming at Shabaz, "fuck you," among other insults.

108.   Said "Scott" Masood ("Masood"), Blue Line Car Driver No. 2461, who also served on the Security Committee, was present at the dinner and observed Chairman Wally physically and verbally abuse Shabaz.

109.   When Masood tried to intervene, Chairman Wally continued to make inappropriate comments, this time about Pakistani people in general, when he told Masood:  "You don't know these people. You have to hit them. In my country, this is what we do."

110.   Although Shabaz contested the baseless slips issued against him by Chairman Wally, Defendants' management team did nothing to remedy Chairman Wally's discriminatory treatment of Shabaz.

111.   Shabaz stepped down from the Security Committee and ultimately left Blue Line in or about 2012.

112.   Similarly, Plaintiff's brother, Rashid Arshad ("Rashid"), openly objected to Chairman Wally's discriminatory treatment of Pakistani drivers during his short tenure on the Security Committee.

113.   Chairman Wally retaliated against Rashid by attempting to impose an unprecedented $10,000 in fines on him for alleged violations of the Blue Line Handbook.

114.   Rashid complained to Defendants' management team about Chairman Wally and the exorbitant fines he imposed on him.

115.   In response, Defendants' management team overruled Chairman Wally and Rashid agreed to pay a reduced fine.

116.   Ultimately, Rashid and another Pakistani driver who is a Sunni Muslim, Syed Ulhasan ("Ulhasan"), Blue Line Car Driver No. 2325, stepped down from their positions on the Security Committee to protest Chairman Wally's discriminatory treatment of Pakistani drivers.

117.   At a meeting of Pakistani drivers held before the so-called election for Security Committee Chairman in 2012, Ulhasan told his colleagues that he had stepped from the Security Committee because

Chairman Wally "cursed our community" by saying "very bad things about Pakistani's in his [native] language" during Security Committee meetings.

118.   Ulhasan also said that when he complained to Chairman Wally about his verbal abuse of Pakistani drivers in the Security Committee room, Chairman Wally dismissed his concerns by stating that his harassment of Pakistani drivers was "the American way."

119.   During that meeting of Blue Line Pakistani drivers, Rashid corroborated Ulhasan's observations, telling his colleagues that Chairman Wally "attacked the Pakistani community" by constantly referring to Pakistani drivers as "fucking Pakistanis" during Security Committee hearings and other meetings.

120.   Shortly after he stepped down from the Security Committee, Rashid left in or about the summer of 2013 because he could no longer tolerate the hostile work environment at Blue Line.

121.   Even non-Pakistani members of the Security Committee protested Chairman Wally's discriminatory treatment of drivers.

122.   For example, in or about 2013, Arsen Gadaev ("Gadaev"), Blue Line Car Driver No. 2495, who is originally from Russia, resigned from the Security Committee in protest after Chairman Wally failed to punish an Iranian driver, Mohammad Rouzbayani ("Rouzbayani"), Blue Car Driver No. 2491, for failing to pick-up a client during a morning job, which is punishable

with a $150 fine and exclusion from morning work for thirty (30) days according to the Blue Line Handbook.

123.    During the Security Committee meeting about Rouzbayani, Gadaev complained about Chairman Wally's conduct in front of Rashid, Masood and others saying, "You cannot let someone go [undisciplined] just because they speak your language."

124.    Upon information and belief, Chairman Wally and Rouzbayani are both Shiite Muslims.

**Plaintiff Complained About Chairman Wally's Harassment; Defendants Refused To Remediate The Situation And Defendant Solomon Warned Arshad That He Would Be Subjected To Retaliation**

125.    Arshad met with Defendant Solomon on or about December 12, 2013 to complain about Chairman's Wally increasingly severe harassment.

126.    During that meeting, which Plaintiff recorded and is available in its entirety **here**[1], Defendant Solomon did not say or otherwise indicate that he would take any action to stop Chairman Wally's treatment of Arshad.

127.    Instead, Defendant Solomon warned Plaintiff that he should call Chairman Wally and ask for forgiveness, or else "your life will be miserable."

128.    As their discussion, reproduced in part below demonstrates, Defendant Solomon actively tried to dissuade Arshad from pursuing legal action to remedy the hostile work environment at Blue Line, by telling Plaintiff that the Security Committee had a "right" to harass him and that

---

[1] *Also available at*
https://www.dropbox.com/s/sds47zffuv5m1sb/fullsolomonrecording.MOV

any lawsuit Plaintiff brought against Chairman Wally would be fruitless and

invite certain retaliation:

Arshad:   I am taking [Chairman Wally] to the court.

Solomon: To do what?

Arshad:   To file a civil lawsuit.

Solomon: So.

Arshad:  At least something will come out of it.  He will stop bothering me.

Solomon: Remember 477.

Arshad:   He's still working.

Solomon: Very little, very little. [Inaudible] 477 ended up having to pay a
            lot of money. He had a small fine, this or that.  Ended up having
            to pay twenty grand. Why do you want to do that? Because you
            are going to have to sue, get a lawyer. It's a big deal when you do
            that. There is nothing to be gotten out of suing. If you want to go
            to small claims court for 200 go ahead.

Arshad:   It's harassment.  They are harassing me.

Solomon: And you know what [inaudible] is going to say? They have a
            right to harass you . . . .

Arshad:   Fred you are not helping me really. It's not the way we should be
            working here.

Solomon: I understand, but you know what, the Security Committee in
            our group should have very little to do.  If I had 200 drivers just
            like you, ok, there would be no real reason for a security
            committee because nobody would do things wrong.
            Unfortunately, we do have some idiots like the guy who blew up
            470 . . . For the love of me, I don't understand why Wally wants
            to be Chairman.  He must have an ego thing, ok.

129.    Approximately one week after this conversation with Defendant

Solomon, Plaintiff sent Defendant Solomon an e-mail, wherein he complained

about the hostile work environment he was being subjected to by Chairman Wally again.

130.    In that e-mail, Arshad also questioned why Blue Line dispatch failed to assign to him any "SUV jobs," which earn a higher rate of pay.

131.    Arshad purchased an SUV for approximately $49,000 in or about August or September 2013 at the suggestion of Defendant Solomon, who told Plaintiff that he could earn more if he purchased an SUV because "SUV jobs" paid a higher rate than regular jobs at Blue Line.

132.    By December 2013, Plaintiff had complied with all Blue Line requirements and inspections of his SUV as defined by the Blue Line Handbook, and he was eligible to bid on SUV jobs.

133.    By the time Plaintiff qualified to obtain SUV jobs in or about December 2013, he had already complained to Defendant Solomon about Chairman Wally's discriminatory harassment several times.

134.    Defendants retaliated against Plaintiff for complaining about Chairman Wally's harassment by assigning to him only one (1) job at the SUV rate, which occurred on December 29, 2013.

135.    From in or about December 2013, when he eligible to obtain SUV jobs, until his constructive discharge on March 6, 2014, Arshad absorbed the significant expense of running a luxury SUV, which cost him thousands of dollars in additional gas and insurance costs, compared to the Mercedes he had previously used for Blue Line work.

136.    On or about March 6, 2014, Arshad received a call from the Security Committee's Treasurer, Youssef Khairy, Blue Line Driver No. 2326, who demanded that Plaintiff pay the $200 fine that day.

137.    When Arshad asked Khairy if he could attend the next scheduled Security Committee meeting to resolve issues regarding any outstanding slips, Khairy responded that Plaintiff was "blue" and hung up.

138.    Shortly thereafter, Arshad's access to the Blue Line dispatch system was cut off and remains that way to this day, depriving Plaintiff of the main benefit afforded to him by the franchise agreement he entered into with Defendant John Acierno to work at Blue Line.

139.    During the evening of March 6, 2014, Arshad e-mailed Defendant Solomon several times, asking for help.

140.    In his response, Defendant Solomon falsely claimed that Plaintiff was not on the SUV list because his car had not been inspected by the Security Committee.

141.    Additionally, Defendant Solomon informed Plaintiff that he was fined because he had failed to show up for the disciplinary meeting that Solomon, himself, repeatedly told Arshad he did not have to attend.

142.    Arshad complained to Defendant Jeffrey Acierno in an in-person conversation and in two follow-up e-mails sent during the Spring of 2014.

143.    In one e-mail to Defendant Jeffrey Acierno, Plaintiff described some of the discriminatory and retaliatory conduct he had been subjected to

by Chairman Wally, and Defendant Solomon's inaction in response to his complaints, in the following:

> Chairman got some serious personal issues & hate with certain people. . . . After our discussion on 03/12, [I] came to this [c]onclusion, that Chairman has all power & [a]uthority & he can misuse his power which is given to him by management.

144. To date, Defendant Jeffrey Acierno has not responded to Plaintiff's complaints about Chairman Wally's discriminatory and retaliatory treatment and Defendant Solomon's failure to remedy it despite Plaintiff's numerous complaints.

145. Plaintiff remains "blue" to date and is therefore prohibited from working for Blue Line.

146. As a result of Defendants' discriminatory and retaliatory treatment, Arshad has sustained significant emotional and economic damage.

## COUNT I

## HOSTILE WORK ENVIRONMENT IN VIOLATION OF 42 U.S.C. §1981 AGAINST ALL DEFENDANTS

147. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

148. Defendants engaged in intentional discrimination by permitting a racially hostile work environment to exist at Blue Line where Plaintiff worked.

149.    Defendants allowed the hostile work environment to exist despite Plaintiff's complaints about the harassment he was subjected to by Chairman Wally.

150.    Defendants' actions proximately caused Plaintiff's injuries.

## COUNT II

## RETALIATION IN VIOLATION OF 42 U.S.C. §1981

## AGAINST ALL DEFENDANTS

151.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

152.    Plaintiff's complaints about a hostile work environment constitute protected activity.

153.    After Plaintiff complained about Defendant Chairman Wally's discriminatory harassment, Defendants failed to assign to Plaintiff high-paying SUV jobs and cut off Plaintiff's access to Blue Line's dispatch system by making him "blue" because of baseless disciplinary allegations raised against him by Defendant Chairman Wally, resulting in Plaintiff's constructive discharge from Blue Line, which Defendants have condoned by failing to remedy the situation to date.

154.    As a consequence of Defendants' retaliatory treatment, Plaintiff has suffered severe emotional distress.

155.    Defendants' actions proximately caused Plaintiff's injuries.

## COUNT III

## HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

## AGAINST ETG DEFENDANTS

156. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

157. ETG Defendants engaged in intentional discrimination by permitting a hostile work environment to exist at Blue Line where Plaintiff worked.

158. Defendants allowed the hostile work environment to exist despite Plaintiff's complaints about the discriminatory harassment he was subjected to because of his race and/or national origin and/or religion by Chairman Wally.

159. As a consequence of being subjected to a hostile work environment because of his race and/or national origin and/or religion while working for ETG Defendants, Plaintiff has suffered severe emotional distress.

160. ETG Defendants' actions proximately caused Plaintiff's injuries.

## COUNT IV

## RETALIATION IN VIOLATION OF TITLE VII

## AGAINST ETG DEFENDANTS

161. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

162.    Plaintiff's complaints regarding discriminatory harassment constitute protected activity.

163.    After Plaintiff complained about Defendant Chairman Wally's discriminatory harassment, ETG Defendants failed to assign to Plaintiff high-paying SUV jobs and, cut off Plaintiff's access to Blue Line's dispatch system, resulting in Plaintiff's constructive discharge from Blue Line, which ETG Defendants have condoned by failing to remedy the situation to date.

164.    As a consequence of ETG Defendants' retaliatory treatment, Plaintiff has suffered severe emotional distress.

165.    ETG Defendants' actions proximately caused Plaintiff's injuries.

## COUNT V

## HOSTILE WORK ENVIRONMENT IN VIOLATION OF NYC HUMAN RIGHTS LAW AGAINST ALL DEFENDANTS

166.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

167.    Defendants engaged in intentional discrimination by permitting a hostile work environment to exist at Blue Line where Plaintiff worked.

168.    Defendants allowed the hostile work environment to exist despite Plaintiff's complaints about the harassment he was subjected to by Chairman Wally because of his race and/or national origin and/or religion.

169.    Defendants' actions proximately caused Plaintiff's injuries.

## COUNT VI

## RETALIATION IN VIOLATION OF NYC HUMAN RIGHTS LAW

## AGAINST ALL DEFENDANTS

170.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

171.   Plaintiff's complaints regarding discriminatory harassment constitute protected activity.

172.   After Plaintiff complained about Defendant Chairman Wally's discriminatory harassment, Defendants failed to assign to Plaintiff high-paying SUV jobs and cut off Plaintiff's access to Blue Line's dispatch system by making him "blue," resulting in Plaintiff's constructive discharge from Blue Line, which ETG Defendants have condoned by failing to reverse.

173.   As a consequence of Defendants' retaliatory treatment, Plaintiff has suffered severe emotional distress.

174.   Defendants' actions proximately caused Plaintiff's injuries.

## JURY DEMAND

175.   Plaintiff requests a jury trial on all questions of fact raised by this Complaint.


WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.     Declare Defendants' conduct complained of herein to be in violation of Plaintiff's rights as secured by 42 U.S.C. §1981, Title VII and the New York City Human Rights Law;

B.     Award Plaintiff compensatory damages to be determined by the jury at the time of trial;

C.     Award Plaintiff punitive damages to be determined by the jury at the time of trial;

D.     Award Plaintiff pre-judgment interest;

E.     Award Plaintiff reasonable attorneys' fees and costs, including the fees and costs of experts, incurred in prosecuting this action;

F.     Grant such further as the Court deems proper and necessary.


Dated: March 20, 2015

                                Respectfully submitted,

                                LAW OFFICE OF DANIELA NANAU, P.C.


                                _____
                                DANIELA NANAU

                                89-03 Rutledge Avenue
                                Glendale, New York 11385
                                Telephone: (888) 404-4975
                                Facsimile: (718) 998-6916
                                E-Mail: dn@danielananau.com

                                ATTORNEYS FOR PLAINTIFF