UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
MUHAMMAD ARSHAD,

               Plaintiff,

     - against -                    **MEMORANDUM AND ORDER**

TRANSPORTATION SYSTEMS, INC.,
EXECUTIVE TRANSPORTATION GROUP        15 Civ. 2138 (NRB)
LTD., LOVE LIMOUSINE NYC, LTD.
d/b/a BLUE LINE, JOHN ACIERNO,
JEFFREY ACIERNO, FRED SOLOMON,
and HAIDER "WALLY" HAIDERE,

               Defendants.
----------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


    In this employment discrimination case, plaintiff Muhammad
Arshad alleges that defendants, who own and operate a for-hire
limousine transportation company, discriminated and retaliated
against him in violation of federal and New York City law.
Presently before the Court is defendants' motion to compel
arbitration and stay the case pursuant to Sections 3 and 4 of the
Federal Arbitration Act, or, in the alternative, to dismiss the
case pursuant to Federal Rule of Civil Procedure 12(b)(6).  For
the following reasons, defendants' motion is granted in part in
that the Court finds that the matter must be sent to arbitration
for a determination on the question of arbitrability.  The
remainder of the motion is denied as moot.

## I. BACKGROUND[1]

Defendants Transportation Systems, Inc. and Executive Transportation Group Ltd. are in the business of "luxury car and limousine transportation services," also known as the "black car" industry. Compl. ¶¶ 11-12. Plaintiff claims these defendants run their black car business through a number of separately incorporated companies, including defendant Love Limousine NYC, Ltd. ("Love Limousine"), which does business under the name Blue Line Corporate Car ("Blue Line"). Id. ¶¶ 13, 16.[2] The individual defendants John Acierno, Jeffrey Acierno, and Fred Solomon are each, according to plaintiff, managers and owners of the corporate defendants. Id. ¶¶ 22-23, 30-31, 38.

Blue Line operates by selling "subscriptions" or "franchises" to individual drivers. Id. ¶¶ 52, 55-56; Mem. 3. In exchange for certain payments to Blue Line, these drivers ("subscribers" or "franchisees") obtain the right to accept dispatches from Blue Line's computerized dispatch network and drive Blue Line customers. Compl. ¶¶ 55, 62; Mem. 3.

---

[1]   Factual background is drawn principally from plaintiff's amended complaint, ECF No. 12 ("Compl."). We also consider defendants' memorandum of law in support of their motion, ECF No. 18 ("Mem."), plaintiff's memorandum of law in opposition, ECF No. 20 ("Opp'n"), defendants' reply memorandum of law, ECF No. 24 ("Reply"), and the documents submitted in support of the memoranda, ECF Nos. 16-17, 21.

[2]   Defendants dispute plaintiff's "conclusory assertions about the relationship among these entities." Mem. 20. This dispute is immaterial for our present purposes.

On September 15, 2009, plaintiff entered into an agreement with Love Limousine to purchase a Blue Line franchise.  Compl. ¶ 62; see Decl. of Bradley J. Nash, Esq. in Supp. of Mot. to Compel Arbitration ("Nash Decl.") Ex. 2 ("Subscription Agreement").  The agreement provides, inter alia, that plaintiff "will abide by the rules and regulations set forth in the Company's manual of rules and regulations."  Subscription Agreement § 5.4.  This manual is the "Blue Line Rulebook," Compl. ¶ 64, a set of rules, procedures, and penalties pertaining to Blue Line drivers.  See Nash Decl. Ex. 3 ("Blue Line Rulebook").

The Blue Line Rulebook provides for the annual election of a "Security Committee Chairman" by the franchisees.  Id. § 25.  The Chairman, in turn, selects a "Security Committee" of franchisees, id. § 25(h), which is responsible for enforcement of the rules. The Security Committee adjudicates "slips," or formal disciplinary complaints.  Id. § 26(i).  A driver who is issued a slip and either fails to attend an upcoming Security Committee meeting or fails to pay a fine imposed by the Committee is "made blue": temporarily denied access to the Company's dispatch system.  Id. §§ 27(f), (h).  Throughout the time period relevant plaintiff's claims, defendant Haider "Wally" Haidere was the Security Committee Chairman.  Compl. ¶ 77.

The Subscription Agreement also contains an arbitration clause.  It states that:

3

The sole and exclusive method of resolving any claim or
controversy whatsoever between the Company, its
Affiliates, and their respective officers, directors,
other agents, employees and shareholders on the one hand
and the Subscriber . . . on the other hand, unless
otherwise specified in this Subscription Agreement,
shall be binding arbitration according to the procedures
set forth in this section. . . .

Subscription Agreement § 20(a).  The rules for arbitration
are as follows.  First, "[d]isputes which shall be subject to
binding arbitration shall include but shall not be limited
to" three categories of claims[3] that must first be submitted
to the "Blue Line Appeals Committee"[4] within 60 days of the
date the controversy arose.  Id.  After that, the subscriber
must demand arbitration within 180 days of the Appeals
Committee's final determination.  Id.  The arbitration shall
be:

conducted by a single arbitrator and administered by the
American Arbitration Association under its Commercial
Arbitration Rules, or by such other independent and
impartial organization as may be designated by the
Company, and the determination rendered by the
arbitrator shall be final and may be entered in any court
having jurisdiction over the parties.

Id.  For claims outside of the three enumerated categories,
initial submission to the Blue Line Appeals Committee is not

---

[3]     The three categories are disputes involving: "(i) the amount of payment
for or deduction from Subscriber's voucher payments; (ii) any monetary fine
assessed against a Subscriber pursuant to Rules and Regulations promulgated
under this Subscription Agreement; and (iii) any claim for discrimination of
work offered to Subscriber or Subscriber's driver."  Id.

[4]     The Appeals Committee, composed of the Security Committee Chairman and
two representatives of management, also hears appeals of penalties above $1,000
imposed by the Security Committee.  Blue Line Rulebook § 26(j).

required.  Id.  Instead, the claim must simply be submitted
to arbitration within 180 days of the date the controversy
arose.  Id.  Failure to abide by the time limitations for
submitting claims "shall be a complete bar to such claims"
"notwithstanding any longer period that may be provided by
statute or the Commercial Arbitration Rules."  Id.
Additionally,

> each party shall bear its own expenses, including legal
> fees; provided, however, that in the event the
> Subscriber recovers more than two-thirds of the amount
> in controversy, the Company shall reimburse the
> Subscriber's filing fees but no other expenses or fees.
> An arbitrator shall have the authority to award
> compensatory damages only.

Id.

The gravamen of the complaint is that Chairman Haidere -- who
is "Middle Eastern," a "Shia . . . Muslim," and "originally from
Afghanistan," Compl. ¶¶ 43-44 -- discriminated against plaintiff
-- who is "Asian," a "Sunni Muslim," and "originally from
Pakistan," Id. ¶¶ 5-6 -- on the basis of race, religion, and
national origin.  Plaintiff alleges that, throughout 2013 and 2014,
Haidere harassed plaintiff by verbally abusing him, issuing
baseless slips against him, and issuing a $200 fine against him in
excess of the $50 allowed by the Blue Line Rulebook.  Id.  ¶¶ 103-
126.  Plaintiff further claims that when he complained about
Haidere's harassment, he was underassigned work and ultimately
"made blue" on March 6, 2014, constituting retaliation and

constructive termination.  Id. ¶¶ 156–176.  Plaintiff brings claims
of hostile work environment and retaliation under 42 U.S.C. § 1981,
Title VII of the Civil Rights Act of 1964, and the New York City
Human Rights Law.  Defendants move to compel arbitration and stay
the case on the basis of the Subscription Agreement's arbitration
provision, or, in the alternative, to dismiss the action pursuant
to Federal Rule of Civil Procedure 12(b)(6).[5]  ECF No. 15.

## II. DISCUSSION

It is undisputed that the Subscription Agreement is valid and
enforceable; that it contains an arbitration clause; and that, in
general, discrimination and retaliation claims may be subject to
compulsory arbitration when an arbitration provision so provides.
Opp'n 9; Reply 1.  The only disputed issues relating to the
applicability of the arbitration clause are: (1) whether
plaintiff's particular claims fall within the scope of the
arbitration clause; and (2) whether an arbitrator or the Court
should resolve this question of arbitrability.

**A. Legal Standards**

The parties agree that the Federal Arbitration Act, 9 U.S.C.
§ 1 et seq., ("FAA") governs our analysis of the Subscription
Agreement's arbitration clause.  Mem. 6; Opp'n 8.  The standard

---

[5]    Defendant Haidere, who is separately represented, adopts his
codefendants' motion.  ECF No. 14.

for review of petitions to compel arbitration pursuant the FAA, 9 U.S.C. § 4, is akin to the standard applied to motions for summary judgment.  Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003).  Thus, "where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law," the court may grant or deny the petition without a trial.  Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 172 (2d Cir. 2011). The disposition of the present motion turns on the meaning of the arbitration clause: on this issue, there are no material disputed facts and the decisive question is purely legal.

The FAA "reflects an 'emphatic federal policy in favor of arbitral dispute resolution.'" KPMG LLP v. Cocchi, 132 S. Ct. 23, 25 (2011) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985)).  "Courts must rigorously enforce arbitration agreements according to their terms."  Am. Express Co. v. Italian Colors Rest., 133 S. Ct. 2304, 2306 (2013) (internal quotation marks omitted).  Yet because "the obligation to arbitrate nevertheless remains a creature of contract," "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir. 2001) (internal quotation marks omitted).

An initial question is, who decides whether a claim falls within the scope of the mandatory arbitration clause?  There is a general presumption that courts, not arbitrators, decide issues of arbitrability.  Telenor Mobile Commc'ns AS v. Storm LLC, 584 F.3d 396, 406 (2d Cir. 2009).  However, this presumption is rebutted with "clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator."  Contec Corp. v. Remote Solution, Co., 398 F.3d 205, 208 (2d Cir. 2005) (emphasis removed) (internal quotation marks omitted).[6]  Clear and unmistakable evidence exists when an arbitration clause explicitly delegates arbitrability determinations to the arbitrator, or when it incorporates by reference arbitration rules that do so.  See Contec Corp., 398 F.3d at 208 ("[W]hen . . . parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."); Shaw Group Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 122 (2d Cir.

---

[6]     The Subscription Agreement is governed by New York law.  Subscription Agreement § 15.  "New York law . . . follows the same standard as federal law with respect to who determines arbitrability: generally, it is a question for the court unless there is a clear and unmistakable agreement to arbitrate arbitrability."  Contec Corp., 398 F.3d at 208 n.1 (internal quotation marks omitted); see Smith Barney Shearson Inc. v. Sacharow, 91 N.Y.2d 39, 45-46, 689 N.E.2d 884 (1997)).

2003); <u>PaineWebber Inc. v. Bybyk</u>, 81 F.3d 1193, 1202 (2d Cir. 1996).

If there is no such clear and unmistakable evidence, then the court must resolve the issue of arbitrability.  Given that FAA "expresses 'a liberal federal policy favoring arbitration agreements . . . any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'"  <u>Louis Dreyfus</u>, 252 F.3d at 223 (quoting <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 24–25 (1983)).

To determine whether a particular dispute falls within the scope of an agreement's arbitration clause, the Second Circuit has prescribed a three-part inquiry.  <u>Id.</u> at 224.  First, a court should classify the arbitration clause as broad or narrow.  <u>Id.</u> Second, if the clause is narrow, "the court must determine whether the dispute is over an issue that is on its face within the purview of the clause," or, instead, over a "collateral matter" that "will generally be ruled beyond its purview."  <u>Id.</u>  Third, if the arbitration clause is broad, "there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." <u>Id.</u> (internal quotation marks omitted).  An arbitration clause is broad if "the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary

recourse for disputes connected to the agreement containing the clause." <u>Id.</u> at 225.   It is narrow if the language suggests "arbitration was designed to play a more limited role in any future disputes." <u>Id.</u>

**B. Analysis**

We find clear and unmistakable evidence that the Subscription Agreement's arbitration provision delegates the question of arbitrability to the arbitrator.   Specifically, it requires the arbitration to be "administered by the American Arbitration Association under its Commercial Arbitration Rules."   Rule 7 of the American Arbitration Association ("AAA") Commercial Arbitration Rules, in turn, states with respect to jurisdiction that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."   AAA Commercial Arbitration Rules, R-7(a).   The Second Circuit has repeatedly held this arrangement to clearly and unmistakably indicate the parties' intent to delegate the issue of arbitrability to an arbitrator.   <u>See</u> <u>Contec Corp.</u>, 398 F.3d at 208; <u>Shaw Group</u>, 322 F.3d at 122; <u>PaineWebber Inc.</u>, 81 F.3d at 1202.   The same result obtains here.

We find additional support in the expansive breadth of the arbitration provision, which imposes mandatory binding arbitration as "[t]he sole and exclusive method of resolving any claim or

controversy whatsoever" between the parties.  See PaineWebber Inc., 81 F.3d at 1199–1200 (concluding provision requiring arbitration of "any and all controversies" reflects a "broad grant of power to the arbitrators" and clearly evidences "that the parties intended to arbitrate issues of arbitrability"); PRL USA Holdings, Inc. v. United States Polo Ass'n, Inc., No. 14-cv-764 (RJS), 2015 WL 1442487, at *4 (S.D.N.Y. Mar. 27, 2015) (concluding arbitration clause's "broad language" and its incorporation by reference of AAA's Commercial Arbitration Rules constitutes "clear and unmistakable evidence of the parties' intent to have an arbitrator decide the arbitrability of their disputes").

For these reasons, we conclude that the Subscription Agreement reserves the question of whether Arshad's employment discrimination claims are subject to mandatory arbitration for the arbitrator to decide, not this Court.  Accordingly, defendants' motion to compel arbitration is granted so that the question of arbitrability may be presented to the arbitrator.  The Second Circuit has held that when "all of the claims in an action have been referred to arbitration and a stay requested," the district court must stay an action instead of dismissing it.  Katz v. Cellco P'ship, 794 F.3d 341, 347 (2d Cir. 2015), cert. denied, 136 S. Ct. 596 (2015).  Therefore, the action is stayed.

We additionally note that if this Court reached the merits of whether Arshad's claims fall under the Agreement, we would conclude

that they do, and we would grant defendants' motion to compel arbitration on this additional ground.

The arbitration clause is undoubtedly broad. It reaches "any claim or controversy whatsoever" (subject to a list of three enumerated exceptions), a broad phrase indicating the "parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement." Louis Dreyfus, 252 F.3d at 225. See Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 20 (2d Cir. 1995) (an arbitration clause covering "any claim or controversy arising out of or relating to the agreement" is "the paradigm of a broad clause" (brackets omitted)); Alghanim v. Alghanim, 828 F. Supp. 2d 636, 652 (S.D.N.Y. 2011) (same). It therefore triggers a presumption favor of arbitrability. In this context, broad arbitration provisions encompass statutory discrimination claims arising out of a putative employment relationship, even if not explicitly stated in the arbitration clause. See Oldroyd v. Elmira Sav. Bank, FSB, 134 F.3d 72, 76-77 (2d Cir. 1998) (holding retaliatory discharge claim within scope of arbitration clause covering "any, dispute controversy or claim arising under or in connection with Oldroyd's employment agreement" (brackets omitted)), abrogated on separate grounds by Katz, 794 F.3d at 347; Rajjak v. McFrank & Williams, No. 01 CIV 0493 LAP, 2001 WL 799766, at *2-3, *5 (S.D.N.Y. July 13, 2001)

(collecting cases and granting motion to compel arbitration of Title VII and New York state discrimination claims).

We reject plaintiff's claim that the arbitration provision is narrow because it enumerated three categories of disputes that it "shall include but shall not be limited to," none of which refer to civil rights claims. Opp'n 10. First, the phrase "including but not limited to" is "unambiguously exemplary, rather than exclusionary." World Props., Inc. v. Arlon, Inc., 663 F. Supp. 2d 98, 104 (D. Conn. 2009). Adopting plaintiff's interpretation, which would cast doubt on the arbitrability of any claim not explicitly named, would not only run headlong into the presumption in favor of arbitrability, but also render the provision's broad first sentence meaningless, an unacceptable result under basic contract law. See Manley v. AmBase Corp., 337 F.3d 237, 250 (2d Cir. 2003) ("New York law . . . disfavors interpretations that render contract provisions meaningless or superfluous."). Moreover, the clause appears to enumerate this list not to limit the scope of arbitration, but to impose the additional procedural requirement of first submitting these claims, and only these claims, to the Appeals Committee.

We also reject plaintiff's claim that the instant dispute is one of the three types of claims excluded by the arbitration clause. Opp'n 12. Plaintiff contends that because defendants' discrimination culminated in his being "made blue," he was

constructively discharged; therefore, his complaint raises claims
"arising from or in connection with the termination of the
Subscription Agreement," which are excluded from mandatory
arbitration.  However, even accepting as true the facts alleged in
the complaint, Arshad's temporary sanction did not terminate the
Subscription Agreement.  See Compl. ¶¶ 168-169, 176, 188 (alleging
Arshad was "made blue"); Blue Line Rulebook at 4 (defining "blue"
as "[t]emporary denial of a unit's access to the Company's dispatch
system").  See also Compl. ¶¶ 87-88 (distinguishing the penalty
of "being made 'blue'" from "being 'expelled' from Blue Line").
Instead, it appears that had plaintiff paid the $200 fine levied
against him, he could have continued to work and also pursued his
discrimination claims through arbitration.

Plaintiff's remaining arguments are similarly unavailing.
Plaintiff cites White v. Cantor Fitzgerald, L.P., 393 F. App'x 804
(2d Cir. 2010) (summary order), and the related case Dunloy v. BGC
Fin., L.P., No. 12 Civ. 1253 (NRB), 2012 WL 6700070 (S.D.N.Y. Dec.
19 2012), as examples in which an arbitration clause's failure to
explicitly discuss employment discrimination claims supported the
conclusion that it did not cover those claims.  In those cases,
however, "the omission of discrimination claims from the
Employment Agreement [was] significant in comparison to the
explicit inclusion of such claims" in a prior arbitration provision
that had been superseded.  Dunloy, 2012 WL 6700070, at *3 (emphasis

added).  Moreover, in those cases, the employer conceded it neither intended nor drafted the arbitration clause to include employment discrimination claims.  Id.  No such facts are present here.

Finally, we reject the claim that the arbitration provision is unconscionable under New York law.  Opp'n 17.  Plaintiff relies on Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 123–25 (2d Cir. 2010), in which the Second Circuit suggested, but did not hold, that provisions of an arbitration agreement (specifically (1) a 90-day limitations period for demanding arbitration and (2) a fee-shifting provision requiring the award of attorney's fees to the prevailing party) might be substantially unconscionable as applied to certain discrimination claims.  Because the defendants in Ragone agreed to waive the offending provisions, the Court, citing New York law, enforced the arbitration agreement excluding those provisions.  Id. at 124–25.

Ragone therefore offers no help to plaintiff here.  First, because different arbitration terms are at issue, Ragone is factually inapposite.  The Subscription Agreement here imposes a 180-day limitation period and a rule that each side must generally bear its own fees and expenses.  Plaintiff, who incorrectly claims that "[t]he Arbitration Provision at issue here contains the same unconscionable clauses at issue in Ragone," Opp'n 20, offers no analysis as to how these less harsh terms "act 'as a prospective waiver of a party's right to pursue statutory remedies,'" Ragone,

595 F.3d at 125 (quoting <u>Mitsubishi Motors Corp.</u>, 473 U.S. at 637 n.19).   Second, <u>Ragone</u> is clear that even if an arbitration agreement contains unconscionable terms, the appropriate remedy is not to invalidate the agreement to arbitrate but to disregard the offending terms.  <u>Id.</u> at 124; <u>see</u> <u>Schreiber v. K-Sea Transp. Corp.</u>, 9 N.Y.3d 331, 341, 879 N.E.2d 733 (2007).   And, as in <u>Ragone</u>, defendants here have agreed to waive any arbitration terms to the extent they are incompatible with Title VII's statutory regime. Reply 7.   Thus, even if the arbitration clause at issue contained substantively unconscionable provisions, invalidation of the entire agreement to arbitrate would be inappropriate.

For these, reasons, were the question of arbitrability before the Court, we would decide that the instant claims and dispute are within the scope of the parties' agreement to arbitrate.[7]

### III. CONCLUSION

For the foregoing reasons, defendants' motion to compel arbitration and stay the action is granted in part in that the Court finds that the question of arbitrability must be decided by arbitration.   The remainder of defendants' motion is denied as moot.   The Clerk of the Court is directed to terminate the motions pending at ECF Nos. 14 and 15 and to mark this case stayed.

---

[7]   We do not reach defendants' request, in the alternative, that the complaint be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

Defendants are directed to file a brief letter every 60 days informing the Court of the status of the arbitration. The first such report shall be due June 24, 2016.

**SO ORDERED.**

Dated:    New York, New York
          April 25, 2016

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

17